KIEVE LAW OFFICES
  LOREN KIEVE (56280)
2121 BROADWAY STREET, UNIT 3
SAN FRANCISCO, CALIFORNIA 94115
TELEPHONE:    (415) 425-2655 (CELL)
LK@KIEVELAW.COM

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

In re:

    E. LYNN SCHOENMANN,

        Debtor.

**Bankruptcy Case No. 22-30028 - DM**

**Chapter 7**

**OBJECTION OF LOREN KIEVE, AS CREDITOR, TO CLAIM 16-1, FILED BY STUART SCHOENMANN, EXECUTOR, AS AMENDED BY CLAIMS 16-2,16-3,AND 16-4; CLAIM 17-1 FILED BY STUART SCHOENMANN, IN HIS INDIVIDUAL CAPACITY, AS AMENDED BY CLAIM 17-2; CLAIM 18-1 FILED BY CELESTE LYTLE, AS AMENDED BY CLAIM 18-2; CLAIM 19-1 FILED BY COLETTE SIMS, AS AMENDED BY CLAIM 19 AND/OR AS PERHAPS INTENDED 19-2; CLAIM 20-1 FILED BY BETH SCHOENMANN AS AMENDED BY CLAIM 20-2; CLAIM 25-1 FILED BY BETH SCHOENMANN; CLAIM 26-1 FILED BY COLETTE SIMS; CLAIM 27-1 FILED BY CELESTE LYTLE**

Bankruptcy Case No. 22-30028 - DM

-1-
OBJECTIONS TO STUART SCHOENMANN ET AL CLAIMS

Loren Kieve, as creditor,  objects to the claims and amended claims filed by Stuart Schoenmann as Executor (the "Executor") of the Estate of Donn R. Schoenmann (the "Probate Estate") (Claim 16-4) and to the amended claims filed by Stuart Schoenmann, in his individual capacity as a beneficiary (17-2), and Celeste Lytle (18-2) , Beth Schoenmann (20-2) and Colette - Sims (19-2) as "beneficiaries" (collectively, "Beneficiaries").

Stuart Schoenmann, as Executor, and the Beneficiaries have filed the following claims to which objections are made:

16-1, filed by the Executor in the amount of $5,000,000 on March 22, 2022;

16-2, amending Claim 16-1 filed on March 21, 2023, reducing the amount of the claim to $3,785,162.66 and adding the Beneficiaries as co-claimants;

16-3, further amending Claim 16-1 filed on November 16, 2023, increasing the amount of the claim by $407,969.20 to $4,193,131.86;

16-4, amending Claim 16-3 filed on August 11, 2025, increasing the amount of the claim to $16,674,928.42;

17-1, filed by Stuart Schoenmann, individually as a beneficiary and not in his capacity as Executor, on March 22, 2022 in the amount of $5,000,000;

17-2, amending Claim 17-1filed on August 11, 2025 by Stuart Schoenmann, individually as a beneficiary and not in his capacity as Executor, increasing the amount of the claim to $16,674,928.42;

18-1, filed by Celeste Lytle on March 22, 2022 in the amount of $5,000,000;

18-2, amending claim 18-1 filed on August 11, 2025, increasing the amount of the claim to $16,674,928.42;

19-1, filed by Colette Sims on March 22, 2022 in the amount of $5,000,000;

19 (apparently intended to be 19-2), amending claim 19-1 filed by Colette Sims on August 12, 2025, increasing the amount of the claim to $16,674,928.42;

20-1, filed by Beth Schoenmann on March 23, 2022 in the amount of $5,000,000;

20-2, amending claim 20-1 filed by Beth Schoenmann on August 11, 2025, increasing the amount of the claim to $16,674,928.42;

25-1, filed by Beth Schoenmann on November 16, 2023 in the amount of $4,193,131.86 (possibly amending claim 16-2 and/or claim 20-1);

26-1, filed by Colette Sims on November 16, 2023 in the amount of $4,193,131.86 ( possibly amending claim 16-2 and/or claim 19-1);

Bankruptcy Case No. 22-30028 - DM

1    27-1, filed by Celeste Lytle on November 16, 2023 in the amount of $4,193,131.86 (possibly amending claim 16-2 and/or claim 18-1).

2    The Beneficiaries' claims are duplicative and solely derivative of Claim 16-1 (as amended

3    by Claims 16-2 and 16-3 and 16-4). Those claims are Claims 17-1, 7-2, 18-1, 18-2, 19-1, 19

4    (apparently intended to be 19-2), 20-1, 20-2, 25-1, 26-1 and 27-1.

5    **I.      *Kieve adopts and incorporates by reference the objections of the Trustee.*

6    Kieve adopts and incorporates by reference the objections of the Trustee, ECF Doc. 765.

7    **II.     *The Beneficiaries' claims for reimbursement of fees are false and in bad faith.*

8    In addition to being duplicative and derivative of their standing as beneficiaries of the

9    Probate Estate, the claims of Celeste Lytle, Colette Sims and Beth Schoenmann are false claims

10   for "reimbursement" of attorney fees and costs. As discussed below, with one small exception,

11   there is no evidence that any of the claimed "fees and costs" have actually been paid. To the

12   extent any of them might have been paid, the only way they could have been paid is if Stuart

13   Schoenmann did so.  Because neither Beth, Celeste, nor Colette have paid any of the listed fees or

14   costs, they are not entitled to reimbursement or payment of anything. If, by some unknown

15   chance, they have personally paid any of the listed fees or costs, it is incumbent upon each of

16   them to submit documentation and admissible evidence of their payments. It is submitted that

17   Beth, Colette and Celeste have no expectation of any personal liability therefor and were induced

18   to participate as plaintiffs in the probate trial by Stuart's representation that he personally, or the

19   Probate Estate from its recovery, if any, would cover all fees and costs – with Stuart serving as

20   guarantor in the event of a shortfall, or no recovery.  As such, they have knowingly filed false

21   claims in the bankruptcy estate (or someone else has filed them on their behalves, which would

22   also be fraudulent). They should be stricken.

23   **III.  *Stuart Schoenmann's claim for attorney fees should be disallowed in its entirety.*

24   The "Surviving Claim" (16-4) after withdrawal or disallowance of the duplicative,

25   derivative, and bad faith claims filed by the Beneficiaries, consists of:

26   Co-Ownership of Former Community Property
     Ownership of Former Separate Property
27   Fees and Damages Against the Bankruptcy Estate

     Bankruptcy Case No. 22-30028 - DM

28

---

Unliquidated Fees and Damages Against the Bankruptcy Estate

The first two components, as well as parts of the third and fourth, are addressed in the Trustee's objections, in which Kieve joins. This will address the rest.

### A. The Beneficiaries do not have standing.

Neither Beth, nor Celeste nor Colette has standing as creditors in their individual capacities: (1) Any claim that they might have is solely derivative of their status as beneficiaries of the Probate Estate; (2) The Probate Estate has pre-emptively filed its claim that covers each of their beneficial interests, rendering any claim of the Beneficiaries duplicative. There is no authority for the proposition that the Beneficiaries are entitled to duplicative claims.

### B. The Surviving Claim (for attorney fees and costs) should be disallowed.

#### 1. The specific language of the Post Marital Agreement bars recovery.

Stuart Schoenmann as Executor is *not* entitled to attorney fees and costs incurred in the probate litigation  (or any other fees). He relies on an attorney's fee provision in the Post Marital Agreement between Lynn and Donn Schoenmann (the "PMA"). See "Exhibit A to Amended Proofs of Claim, Claim 16-2" at page 4 ("The initial basis for the right to fees is that the PMA contains an attorneys' fee clause . . . . .") ("Filed 03/21/23"). [A copy of the PMA is attached as Ex. 1 to the accompanying declaration of E. Lynn Schoenmann ("ELS Decl."), ¶ 2, Ex. 1.]  See also (amended) Claim 16-4.

The PMA provides:

14. FUTURE A'ITORNEY FEES AND COSTS RELATED TO AGREEMENT

If either party reasonably retains counsel for purposes related to this Agreement, including. but not limited to, enforcing or preventing the breach of any provision, seeking damages for any alleged breach, and seeking declaration of his or her rights or obligations under the Agreement, and the matter is settled by a judicial determination, including arbitration, the prevailing party will be awarded reasonable attorney fees and costs, including witness fees. In all other circumstances each party shall be responsible for his or her own attorney fees and costs.

By its terms and as a matter of law, it does not apply.

#### 2. The "matter" was not "settled by a judicial determination."

Bankruptcy Case No. 22-30028 - DM

-4-

The probate court's "Tentative Decision" was just that.  It was not final. It did not finally resolve all the issues in the proceeding.

### 3. There has been no final judgment, so Civil Code § 1717(a) does not apply.

There has been no final judgment. The bifurcated trial on the validity of the PMA addressed only one of multiple issues in the case. There was, and is, no final judgment adjudicating all the issues asserted in the litigation. As a result, by its terms, Civil Code § 1717(a) does not apply. See *Chen v. Valstock Ventures, LLC,* 81 Cal. App. 5th 957, 974 (2022):

> Nowhere in the legislative history of section 1717 in 1986 or 1987 is there any indication that the Legislature intended to allow for interim awards of attorney's fees upon the resolution of the contract claims in a case even if further litigation remains on noncontract claims. Instead, the Legislature's attempt to create consistency between section 1717 and the procedures for a prevailing party to collect costs reinforces our conclusion that attorney's fees are intended to be part of costs and therefore awarded, like all costs, at the conclusion of the litigation of an action.

### 4. Stuart did not "retain[] counsel for purposes related to th[e] Agreement," but to nullify it, which is not encompassed within its provisions.

The title of the fees provision is itself narrowly written:  it deals with attorney fees and costs "*related to*" the agreement (emphasis added).

The text then repeats this formulation: "If either party reasonably retains counsel for purposes related to this Agreement," followed by examples that give meaning and texture to what the provision was intended to deal with, namely issues between Donn and Lynn as to what the PMA was intended to cover and ensuring that its provisions would be carried out:

> . . . including. but not limited to, enforcing or preventing the breach of any provision, seeking damages for any alleged breach, and seeking declaration of his or her rights or obligations under the Agreement, . . . .

### 5. Allowing attorneys' fees for efforts to <u>undo</u> the PMA is flatly inconsistent with its language and purpose.

Stuart's action in probate court was *not* brought "to, enforce[e] or prevent[] the breach of any provision, seeking damages for any alleged breach, and seeking declaration of his or her rights or obligations under the Agreement, . . . ," as the fee agreement in the PMA provided. It was therefore also not brought under the more general provision "for purposes related to this Agreement."

Bankruptcy Case No. 22-30028 - DM

-5-

1      It was brought to **undo** the entire agreement, based on a claim of "undue influence," that

2  was flatly contrary to the express, and clear, language drafted by Donn's own attorney – not once,

3  but twice – in the PMA that it was *not* entered into under "undue influence.

4      As a result, the provisions in the PMA that "[i]n all other circumstances each party shall

5  be responsible for his or her own attorney fees and costs" apply. Stuart is entitled to no fees or

6  costs. All his other claims for fees and costs are based on and derivative of his unfounded claim

7  that the PMA's fees provision applies; because it does not, those additional claims are also

8  improper.

9              ***6. Attorney fee provisions are subject to careful scrutiny.***

10                  ***(a) Federal bankruptcy law requires strict scrutiny of fee provisions.***

11      Under federal bankruptcy law, "[p]rovisions granting creditor's attorney's fees must be

12  strictly construed to not contradict the traditional American Rule that parties bear their own fees

13  and costs." *In re I-Mind Educ. Sys.*, 269 B.R. 47, 48 (Bankr. N.D. Cal. 2001) (citations omitted).);

14  *see also TCF Inventory Fin., Inc. v. Marker Oil Co.,* No. 2:17-cv-1768-JAM-DB, 2018 U.S. Dist.

15  LEXIS 125506, at *7-8 (E.D. Cal. July 25, 2018) ("Contractual provisions for attorney fees must

16  be strictly construed, and the court must determine the intention of the parties with respect to the

17  payment of attorney fees." (citation omitted.).).

18                  ***(b) California courts also scrutinize fee provisions.***

19      As with federal law, California jurisprudence follows the "American Rule" that,

20  ordinarily, each party to a lawsuit pays its own attorney fees. *Mountain Air Enters., LLC v.*

21  *Sundowner Towers, LLC,* 3 Cal. 5th 744, 751 (2017). Attorney fee provisions in contracts are

22  therefore subject to careful scrutiny as to their terms and application. *Id.*

23      Cal. Code Civ. P. § 1021 permits the parties to agree contractually to an attorney fee

24  provision, which the courts will then scrutinize under contractual interpretation principles. *Id.*

25      In its *Mountain Air Enters.* decision, the Supreme Court undertook a careful analysis of

26  the precise wording of the attorney fee provision in issue.

27

28                                                      Bankruptcy Case No. 22-30028 - DM

-6-
OBJECTIONS TO STUART SCHOENMANN ET AL CLAIMS

. . .we first consider the mutual intention of the parties at the time the contract providing for attorney fees was formed. Our initial inquiry is confined to the writing alone. "'The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" controls judicial interpretation. Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. At the same time, we also recognize the "interpretational principle that a contract must be understood with reference to the circumstances under which it was made and the matter to which it relates."

*Id.,* at 752 (cleaned up).

### *(c) Under both federal bankruptcy and California law, the PMA's fee provision does not apply to Stuart's efforts to undo the PMA.*

The reasoning of *Mountain Air Enters.* applies to the fee provision in the PMA, which begins with the general application to the retention of counsel "for purposes related to this Agreement," followed by the more specific reference: "including. but not limited to, enforcing or preventing the breach of any provision, seeking damages for any alleged breach, and seeking declaration of his or her rights or obligations under the Agreement, . . . ."

"'Where general words follow specific words in a [contractual provision,] the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words. Where the opposite sequence is found, *i.e.,* specific words following general ones, the doctrine is equally applicable, and restricts application of the general terms to things that are similar to those enumerated.'"

*Id.,* at 754 (cleaned up).

Using this canon of contractual construction, the California Supreme Court held that the fee provision applied because the litigation was brought, as the fee provision provided, to enforce the terms of the parties' agreement in accordance with its terms.

Accordingly, we first consider the mutual intention of the parties at the time the contract providing for attorney fees was formed. Our initial inquiry is confined to the writing alone. "'The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage, contra", controls judicial interpretation. Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. At the same time, we also recognize the "interpretational principle that a contract must be understood with reference to the circumstances under which it was made and the matter to which it relates."

*Mountain Air Enters., supra,* 3 Cal. 5th at 752 (cleaned up).

The meaning that a layperson would ascribe to the PMA's fee provision, in context, is that it was not meant to apply to a situation where Donn (or Stuart, as his successor as executor)

Bankruptcy Case No. 22-30028 - DM

sought to invalidate the entire agreement, based on a claim of "undue influence," where he had twice affirmatively attested that there was none in a carefully drafted document written by his own lawyer.

The facts here come squarely within the Ninth Circuit's decision in *In re Coast Trading Co.,* 744 F.2d 686, 693 (9th Cir. 1984) (". . . while both contracts provided for attorneys' fees, this action was not one for the enforcement of the contracts. To the extent that Collingwood has sought to reclaim goods or the proceeds thereof, it has not attempted to enforce the contract but rather to rescind it. By the same token, the claim of cancellation is one of disavowal, not enforcement."); *see also Kosmala v. Rothery (In re Rothery),* C.A. No. 96-56397, C.A. No. 96-56471, 1998 U.S. App. LEXIS 8840, at *4 (9th Cir. May 1, 1998) (reversing an award of attorneys' fees in a fraudulent conveyance action because, while the action "may affect a contract, it is not technically an action on the contract.").

This is consistent with federal bankruptcy caselaw. *See Van De Pol Enters. v. Moniz (In re Moniz),* Nos. 09-90802-E-7, 09-9056, DMS-1, 2011 Bankr. LEXIS 5529, at *20 (Bankr. E.D. Cal. June 23, 2011) ("The contract at issue provides for attorneys' fees only for "[a] breach of any of the terms of this agreement or any other agreement between [Plaintiff] and [Defendant-Debtors] . . ," whether or not an action is filed. It further provides that the right to attorneys' fees is limited strictly to "contract actions.") (contrasting it with "[b]road language in a contractual attorney fee provision" such as "any dispute under the agreement"); *Buena Vista, LLC v. New Res. Bank,* No. C 10-01502 CW, 2011 U.S. Dist. LEXIS 96141, at *10-11 (N.D. Cal. Aug. 26, 2011) ("If the contract's drafters had intended the attorneys' fees provision to apply to all claims "arising out of" the contract, they would have included language to that effect in the Loan Agreement. Many of the cases cited by the bank provide examples of such broad language. *See, e.g., Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 939 (9th Cir. 1999) (fees provision covered "[a]ny dispute, difference, claim or counterclaim between the parties arising out of or in connection with this agreement"); *cf. Mountain Air Enters., LLC v. Sundowner Towers, LLC,* 3 Cal. 5th 744, 757 (2017) (where, unlike the PMA's limited fee provision, the broad fee provision

encompassed "any legal action or any other proceeding, including arbitration or an action for declaratory relief, … because of an alleged dispute, breach, default, or misrepresentation in connection with any provision of this Agreement.").)

### 7. California Civil Code § 1717(a) does not apply.

Stuart did not retain counsel "for purposes related to" the PMA – but for "purposes" directly antithetical to it, namely, to seek to undue it and to disregard its repeated declarations that it was entered into freely and voluntarily without any undue influence or duress on either party's side.

At most, if § 1717(a) were to apply, it would allow Stuart to recover only the actual "reasonable" fees incurred in litigating the PMA. As demonstrated below, he has made no effort to segregate those fees from the lump sum fees he claims for everything he and his lawyers have done in all these proceedings. And only Stuart, as Executor, would have standing to challenge the PMA and be entitled to fees. But again, he has not shown what fees he incurred in that capacity or what ones are directly attributable to those efforts.

### 8. None of Stuart's (or the others') derivative claims allows him to recover attorneys' fees or costs.

Stuart's, et al.'s claims for fees and costs are derivative of their claim that the PMA authorizes them. See "Exhibit A to Amended Proof of Claim, Claim 16-2" ("Filed 03/21/23").

They assert that they are entitled to them because of their "Verified Petition" in the Marin County probate case, and the court's "Tentative Decision" in the bifurcated trial on the validity of the PMA. *Id.* As demonstrated above, the PMA's fees provision is inapplicable, with the result that these derivative or alleged "common" issue claims are also improper.

They then assert that they are entitled to them because that "tentative" decision also "found" that Lynn Schoenmann committed elder abuse and other infractions, entitling them to "statutory fees." The "Tentative Decision" did no such thing.

And then they claim that they are entitled to all of them because their bankruptcy court representation was "on an issue common to both a cause of action in which fees are proper and

Bankruptcy Case No. 22-30028 - DM

-9-

one in which they are not allowed," citing *Reynolds Metals Co. v. Alperson,* 25 Cal.3d 124, 129-30 (1979). *Id.* This is wrong too, for the following reasons.

In his "[c]ommentary regarding the basis for claimed amounts" Stuart recites:

A. The initial basis for the right to fees is that the PMA contains an attorneys' fees clause which awards fees and costs to the prevailing party, and the PMA provides that it inures to the benefit of and is binding on the Parties' respective devisees, heirs, personal representatives, successor trustees, assigns and successors in interest. Moreover, during the Probate Litigation Lynn was clear that if she prevailed on her PMA-based defenses, she would pursue attorneys' fees against all Petitioners. The petitioners were Stuart in his individual capacity as a beneficiary represented by James Lamping; Celeste Lytle, Beth Schoenmann, and Colette Sims, also as beneficiaries, represented by WVBR (and its predecessor firm, Kerr & Wagstaffe); and Stuart as executor, represented by Alicia M. Gamez. Petitioners prevailed in Debtor's attempt to use the PMA she illegally obtained as a defense to claims asserted by each and every Petitioner. As such, Civil Code section 1717 provides both a direct right to fees for each Petitioner prevailing on the contract and, to the extent the scope of that right is limited, a reciprocal right to recover fees for prevailing upon claims in which Lynn had a right to pursue fees.

Not so. First. § 1717 allows attorneys' fees only where "an agreement between the parties provides for the recovery of those fees," *De La Carriere v. Greene*, 39 Cal. App. 5th 270, 275 (2019). As demonstrated above, the PMA did not provide for fees where a party sought, not to enforce it, but to nullify it.

Second, § 1717 applies only where a party has prevailed in a *lawsuit* "An 'action on a contract,' as used in Civil Code section 1717, refers to 'the whole of a lawsuit rather than to discrete proceedings within a lawsuit.'" *Id.,* 39 Cal. App. 5th at 276. The PMA was the result of bifurcated trial, which obviously contemplated further proceedings.

Third, § 1717 applies only to fees "'incurred to enforce the provisions of [the] contract.'" *Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124, 129 (1979). Stuart did not sue to enforce the terms of the PMA, but to invalidate them. See *In re Coast Trading Co.,* discussed above.

Fourth, as also demonstrated above, there has been no final judgment, so § 1717 is not applicable.

B. Regarding apportionment generally, under California law, "[a]ttorney fees need not be apportioned when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed." (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129-30.) Thus, the suggestion that fees must be apportioned is incorrect.

Bankruptcy Case No. 22-30028 - DM

-10-

Not so again. "Where a cause of action based on the contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under section 1717 **only** as they relate to the contract action." *Reynolds Metals Co. v. Alperson*, 25 Cal. 3d at 129 (citation omitted; emphasis added). And: "Describing the attorney's fees provision, section 1717 specifically refers to fees 'incurred to enforce the provisions of [the] contract.' A litigant may not increase his recovery of attorney's fees by joining a cause of action in which attorney's fees are not recoverable to one in which an award is proper." *Id.*

Stuart's other claims against Lynn Schoenmann go far beyond seeking to nullify the PMA. And, as demonstrated above, Stuart's action was not "based on the contract" [the PMA] at all, but based on a claim that it was a nullity. See *In re Coast Trading Co.,* discussed above.

C. Apportionment is also irrelevant as any work not related to the PMA issue was related to the broader issues in the case, which also carry statutory rights to fees. Specifically, a fundamental gravamen of the case is that Lynn was in possession of estate assets, and required to return them. Lynn argued she was not in possession of estate assets because the PMA made them her assets. A Court may award fees where someone "has taken, concealed, or disposed of the property by the use of undue influence in bad faith or through the commission of elder or dependent adult financial abuse." Cal. Prob. Code section 859. Here, Lynn was found to have taken and concealed property by the use of undue influence. Even if she denies that she did so in bad faith, she clearly did so through the commission of elder or dependent adult financial abuse. That requires only a showing that a person "[t]akes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence." Cal. Welf. & Inst. Code section 15610.30(a)(3), which Lynn was plainly found to have done.

There is no basis for this assertion. The Tentative Decision, which is obviously not a final decision, made no such finding, and there is no mention of the statutes cited anywhere in it. Nor is Probate Code § 859's discretionary fees provision applicable. The stipulation for a bifurcated trial did not contemplate that any issue of "financial elder abuse" would be addressed in that trial. The opaque statement in the probate court's Tentative Decision (at 12:5) that "Donn was an abused spouse" was based on an unequal division of property, and nothing more. The statute makes a fee award discretionary, and the probate court did not make a fee award.

D. In addition to section 859 fees, elder financial abuse itself entitles Petitioners to fees. Cal. Welf. & Inst. Code section 15610.30(a) ("Where it is proven by a preponderance of the

Bankruptcy Case No. 22-30028 - DM

-11-

evidence that a defendant is liable for financial abuse, as defined in Section 15610.30, in addition to compensatory damages and all other remedies otherwise provided by law, the court shall award to the plaintiff reasonable attorney's fees and costs").

"Financial abuse occurs when a person or entity "[t]akes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult *for a wrongful use or with intent to defraud*." § 15610.30, subd. (a)(1) (emphasis added). The probate court made no such finding. Lynn Schoenmann simply tried to restore title to the properties to the condition they had occupied for almost all their 25 years of marriage.

In any event, Stuart, et al., have abandoned and/or are barred from making any such claim in dismissing their § 523 litigation with prejudice, *see* Adv. Proc. No. 22-03019, ECF Doc. 78 (09/22/23), which has preclusive effect to the claims and issues asserted as a final judgment on the merits. *Int'l Union of Operating Engineers-Employers Construction Industry Pension, Welfare and Training Trust Funds v. Karr,* 994 F.2d 1426, 1429 (9th Cir. 1993) (voluntary dismissal with prejudice was a "final judgment on the merits" preventing reassertion of same claim in subsequent action).

E. In addition, Petitioners also defeated the PMA expressly because Lynn obtained it in breach of the fiduciary duties set forth in Family Code section 721. This provides a third entitlement to fees. Cal. Fam. Code section 1102(e) ("Remedies for breach of the fiduciary duty by one spouse, including those set out in Sections 721 and 1100, shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs"). All Petitioners have an interest in, and asserted claims against Lynn for, her breach of fiduciary duty.

No assets were undisclosed or transferred. There is no evidence, and can be none, to the contrary. Nor did the Tentative Decision determine that the PMA was not enforceable "expressly because Lynn obtained it in breach of the fiduciary duties set forth in Family Code section 721." The words "fiduciary duty" appear nowhere in it.

F. Also, a note regarding beneficiary standing in the Probate matter. Debtor is wrong that only the Executor has standing to claim attorney fees for setting aside the PMA. Standing is conferred in the plain language of Probate Code section 850 and the related statutes. Probate Code section 850 expressly provides standing to request orders where "the decedent died having a claim to real or personal property, title to or possession of which is held by another." Probate Code section 850(a)(2)(D). Such a claim may be brought by "[t]he personal representative or any interested person." Probate Code section 850(a)(2). An interested person includes "[a]n heir, devisee, child, spouse, creditor, beneficiary, and any other person having a property right in or claim against a trust estate or the estate of a

decedent which may be affected by the proceeding." Cal. Prob. Code section 48(a)(1). Lynn never challenged the standing of any Petitioner in the probate Court.

None of the cited statutes can be found anywhere in the Tentative Decision.

G.  The beneficiaries did not bring the elder abuse claim, because only Stuart as executor had standing to do so. Cal. Welf. & Inst. Code section 15657.3(d). That said, the exact same facts and legal arguments are relevant to the elder abuse, breach of fiduciary duty, and section 850 claims, including because elder abuse concepts are expressly tied to the penalties and fees the beneficiaries sought under section 850. The Judge in Probate Court made findings that plainly established the beneficiaries' section 850 claims were proven at trial, with the result that the PMA is void. As discussed above, under California law, apportionment is not required among causes of action.

The probate court never addressed *anything* other than the validity of the PMA. There has been no finding, implicit or otherwise, of elder abuse or anything else. To the contrary, Stuart and his siblings dismissed with prejudice their § 523 adversary proceeding seeking a determination of Lynn Schoenmann's alleged elder abuse and the like. *See* Adv. Proc. No. 22-03019, ECF Doc. 78 (09/22/23).  They are therefore barred from raising it again.

Cal. Welf. & Inst. Code § 15657 is not applicable in any event. It provides (emphasis added):

> Where it is proven by *clear and convincing evidence* that a defendant is liable for *physical abuse* as defined in Section 15610.63, or neglect as defined in Section 15610.57, and that *the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse,* the following shall apply, in addition to all other remedies otherwise provided by law:

> (a) The court shall award to the plaintiff reasonable attorney's fees and costs…

There was no pre-petition attempt to prove any of the elements of § 15657, nor is there any suggestion that the elements could be proved. Nor any determination by "clear and convincing evidence" of anything. Physical abuse has never been alleged, and Stuart *et al.* are barred from bringing any such claim because they dismissed their § 523 proceeding with prejudice.

### 9.  *Stuart, et al. are not entitled to the other fees and costs they claim.*

*(i)*     *Lamping fees and costs, Claim 16, Part 6:* Mr. Lamping represented Stuart Schoenmann in his individual capacity during the probate litigation.  He was not retained by the

Bankruptcy Case No. 22-30028 - DM

-13-

Probate Estate. There is no *prima facie* basis to assert Bankruptcy Estate liability for his fees and costs, and none has been articulated. These fees and costs should be disallowed.

(ii) ***Busch and related firm fees and costs, Claim 16, Part 7:*** The Wagstaff firm represented Beth Schoenmann, Celeste Lytle and Colette Sims during the probate litigation. The firm was not retained by the Probate Estate. There is no *prima facie* basis to assert Bankruptcy Estate liability for the firm's fees and costs incurred in representation of beneficiaries, and none has been articulated. These fees and costs should be disallowed. The same holds true for the other entities encompassed within the Busch submission.

(iii) ***Alicia M. Gamez fees and costs, Claim 16, Part 8:*** Ms. Gamez has represented, and continues to represent, Stuart Schoenmann as Executor of the Probate Estate in three different, discrete capacities: (1) before the Probate complaint was filed as counsel to the Probate Estate; (2) throughout the probate litigation; and (3) subsequent to the probate litigation as counsel to the Executor as a creditor in the Bankruptcy Estate and as ongoing general counsel to the probate estate. No attempt has been made to carve out relevant portions of the fees and costs attributable to her representation in these three discrete capacities. With respect to (1) and (3) above, there is no *prima facie* basis to assert Bankruptcy Estate liability for costs incurred in the routine administration of a probate estate, nor in the representation of a creditor in a bankruptcy estate, nor has any credible basis been articulated. With respect to (2) above, no fees and costs can be awarded outside of the Executor's claim for reimbursement of those fees, which has been addressed above. These fees and costs should be disallowed.

(iv) ***Armanio LLP (Chylinski) fees and costs, encompassed within the Gamez claim, Claim 16, Part 8:*** Mr. Chylinski was one of two expert witnesses for the Probate Estate in the PMA litigation. These are costs of litigation for which Stuart asserts a claim for reimbursement pursuant to the attorneys' fees provision of the PMA, which is addressed above, and for the reasons articulated above should be disallowed.

Bankruptcy Case No. 22-30028 - DM

-14-

Case: 22-30028   Doc# 784   Filed: 11/10/25   Entered: 11/10/25 09:11:52   Page 14 of 27

1       *(v)     Consilio (data management), encompassed within the Gamez claim, Claim 16, Part 8:*

2       No explanation is provided regarding who "Consilio" is or what "data management"

3       Consilio provided.  With no showing of a benefit to the Bankruptcy Estate, this portion of

4       the claim should be disallowed.

5  *(vi)    Lapping fees and costs, Claim 16, Part 10:*  Counsel to Stuart Schoenmann as Executor

6       of the Probate Estate, creditor in the bankruptcy estate. No credible showing has been

7       made to deviate from the traditional American rule that parties bear their own fees and

8       costs (see above). and this portion of the claim should therefore be disallowed.

9  *(vii)   Stuart Schoenmann, as Executor, "general fees, general expenses, delay damages,*

10      *settlement damages, in the aggregate $1,254,651.87," submitted as part of the previous*

11      *claim:*  Whatever Stuart Schoenmann may decide to do in his capacity as Executor of the

12      Probate Estate is largely, if not wholly, without recourse to the Bankruptcy Estate. Fees

13      and costs incurred in the administration of the Probate Estate are obligations of the

14      Probate Estate. Stuart has articulated no credible basis for exception to the general rule

15      that parties under these circumstances are responsible for their own fees and costs.

16  *(viii)  Plus: $407,969.20 per amended claim #16-3.*  This amount consists of fees and costs

17      incurred post-petition as follows:

| | |
|---|---|
| Law Offices of Miriam Hiser | $133,090 |
| WVBR Law Offices | $105,340 |
| Law Office of Alicia M. Gamez | $30,559 |
| Law Offices of James Shepherd | $25,705 |
| General Fees of the Executor | $66,675 |
| Consilio Fees Data Management | $23,138 |
| Financial Accounting: | $17,187 |
| Bond Premium | $6,274 |

    Apparently, the Executor believes the Bankruptcy Estate should be funding the

administration of the Probate Estate indefinitely.

    There is no authority for this undertaking. No authority is cited in rebuttal of the general

rule that parties are responsible for their own fees and costs – particularly fees and costs incurred

years after the subject litigation ended. These amounts should be disallowed.

Bankruptcy Case No. 22-30028 - DM

1    *IV. The remainder of the "Surviving Claim is meritless.*

2           *A. Claims arising from co-ownership*

3        See Trustee objection.

4           *B. Claims asserted in connection with 920 Powell.*

5        See Trustee objection.  In addition, the liquidation of 920 Powell resulted in a massive

6    windfall to the Probate Estate. There are no cognizable damages, and the Probate Court never

7    legitimately had jurisdiction over the Debtor's interest in 920 Powell. No claim relating to 920

8    Powell should be allowed.

9    *V. Stuart's overreaching, unsubstantiated fees and costs request is not properly supported and
     should be rejected.*

10

11       Part 3 of Stuart's previously-submitted claim seeks "Fees and Damages Against the

12   Bankruptcy Estate."

13       This includes:

     James P. Lamping fees and costs:              $181,713.04
14   Wagstaff firm fees and costs:                  $988,633.29
     Alicia M. Gamez fees and costs:               $734,598.39
15   Armanio LLP (Chylinski) fees and costs:       $152,398.75
     Dr. Harry Morgan (included in Gamez)
16   Consilio (data management)                     $92,024.12
     Trodella and Lapping LLP fees and costs:      $152,292.92
17   Stuart Schoenmann, as executor, "general fees"        $981,548.75
     Stuart Schoenmann, as executor, "general expenses:    $118,567.30
18   Stuart Schoenmann, as executor, "delay damages"       $154,535.82
     Stuart Schoenmann, as executor, "settlement damages": $228,850.28
19   Total:                                       $3,785,162.66
     *Plus*                                         $407,969,20
20   For a grand total of:                         $4,193,131.86

21       Stuart et al. have amended their claims to seek additional sums he claims to have

22   subsequently "incurred." See, e.g., Claim 16, Part 2.  These now comprise:

| | |
|---|---|
| Law Office of James P. Lamping Fees & Costs | $  181,713.04 |
| Kerr & Wagstaffe LLP Fees & Costs | $   7,540.00 |
| Wagstaffe, von Loewenfeldt, Busch & Radwick, LLP Fees & Costs | $ 1,096,767.82 |
| Coblentz, Patch, Duffy & Bass, LLP Fees & Costs | $  68,691.13 |
| Law Office of Alicia M. Gamez Fees & Costs | $ 1,108,889.01 |

28                                          Bankruptcy Case No. 22-30028 - DM

Case: 22-30028    Doc# 784    Filed: 11/10/25    Entered: 11/10/25 09:11:32    Page 16 of
27

| | |
|---|---|
| Trodella & Lapping Fees & Costs | $ 215,908.93 |
| Law Offices of Miriam Hiser Fees | $ 162,780.00 |
| Law Office of Wayne A. Silver Fees | $ 129,561.65 |
| JKZ LLP - Nathan D. Borris Fees | $ 67,204.50 |
| Law Offices of James Shepherd Fees | $ 32,882.50 |
| Stuart Schoenmann, Executor (Total) | $ 1,483,502.15 |

### A. The fee claims are overreaching, duplicative and unsupported.

As in *Van De Pol Enters. v. Moniz (In re Moniz),* Nos. 09-90802-E-7, 09-9056, DMS-1, 2011 Bankr. LEXIS 5529, at *26 (Bankr. E.D. Cal. June 23, 2011),

> The court has reviewed the billing records introduced by Plaintiff in support of this application. No analysis of the time expended has been provided, leaving the court with merely a pile of paper to sift through and determine what fees are part of this adversary proceeding and which are part of Plaintiff's general unsecured claims in the Moniz, Inc. and the Defendant-Debtors' bankruptcy cases. Complicating this process is that the billing records do not clearly delineate the fees relating to the "action on the contract" and the statutory issues. It is the Plaintiff's burden to provide the court with evidence in support of the relief requested.

Stuart has not done so.

### B. Stuart has not met his burden of justifying the claimed fees and expenses.

As one district court emphasized,

> . . . The burden is on the moving party to present sufficiently detailed time records to justify the awarding of attorneys' fees based on the hours claimed. *Gates,* 987 F.2d at 1397 ("The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked."); *Chalmers,* 796 F.2d at 1210 ("In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended."). Because the movant bears this burden, the district court is "neither obligated to explain what type of records should be submitted, nor to request additional information." *In re Wash. Public Power Supply Sys. Secs. Litig.,* 19 F.3d 1291, 1306 (9th Cir. 1994). Accordingly, the court will not seek nor allow belated submission of further information about what the redacted portions actually reflect.

*Mitchell v. Chavez,* No. 113CV01324DADEPG, 2018 WL 3218364, at *8 n.7 (E.D. Cal. June 29, 2018). And as the D.C. Circuit emphasized in *Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.,* 129 F.3d 143, 151 (D.C. Cir. 1997):

Bankruptcy Case No. 22-30028 - DM

1
2
3

The reasonableness of any one entry on an attorney's billing statement is likely to be informed by other charges incurred for the same general service. For example, the court needs to determine: Has the attorney over-charged for its services by expending a ridiculous amount of total time on a simple research task? Did the work undertaken encompass issues and tasks outside the scope of the question being litigated? Was each task undertaken a necessary and reasonable component of a reasonable litigation strategy?

4

Stuart's, *et al.*'s fee submission does not try to deal with this conundrum. What value, if

5

any, did all the sundry lawyers add in what appears on its face as duplicative work?

6

It was incumbent upon Stuart *et al.,* to submit complete billing records as part of their

7

claim and to make them available for the Court's (as well as the trustee's and creditors') review.

8

This is standard procedure. *Huynh v. Hous. Auth. of Cty. of Santa Clara,* No. 14-CV-02367-LHK,

9

2017 WL 1050539, at *4 (N.D. Cal. Mar. 17, 2017) ("Under the Civil Local Rules for United

10

States District Court for the Northern District of California, a motion for attorneys' fees and costs

11

must include ... (2) detailed billing records showing how much time was spent on each task"); *see*

12

*also Johnson v. FCA US LLC,* No. 3:17-CV-0536-AJB-BGS, 2019 WL 3891148, at *2 (S.D. Cal.

13

Aug. 19, 2019) ("A fee applicant must provide time records documenting the tasks completed and

14

the amount of time spent" (citations omitted).); *cf. Jane L. v. Bangerter,* 61 F.3d 1505, 1510 (10th

15

Cir. 1995) (fee application must "prove and establish the reasonableness of each dollar, each

16

hour, above zero" based on "meticulous time records that 'reveal . . . all hours for which

17

compensation is requested and how those hours were allotted to specific tasks'" (citation

18

omitted)).

19

**C. Stuart has not submitted admissible evidence to support the fee claim.**

20

Stuart's Claim 16 (as with the rest of the claims) is based solely on the declaration by one

21

person, and only one person, Wayne A. Silver, that "I have examined the information in this

22

Proof of Claim and have a reasonable belief that the information is true and correct."

23

That does not come close to sufficing.

24

"The fee applicant has the burden to produce evidence, other than the declarations of

25

interested counsel, that the requested rates are in accordance with those prevailing in the

26

community for attorneys of comparable skill and reputation." *Monolithic Power Sys., Inc. v. O2*

27

*Micro Int'l Ltd.*, No. 08-04567 CW, 2012 WL 161212, at *2 (N.D. Cal. Jan. 17, 2012) (citation

28

Bankruptcy Case No. 22-30028 - DM

-18-
OBJECTIONS TO STUART SCHOENMANN'S FEE CLAIMS

omitted; emphasis added), aff'd, 726 F.3d 1359 (Fed. Cir. 2013), and aff'd, 726 F.3d 1359 (Fed. Cir. 2013); *see also Allianz Life Ins. v. Agorio,* 852 F. Supp. 2d 1163, 1169 (N.D. Cal. 2012) ("An attorney's declaration regarding the reasonableness of his or her own rate, standing alone, is insufficient to meet the fee applicant's burden").

Mr. Silver's declaration does not attempt to meet this requirement. *See also Martino v. Denevi,* 182 Cal. App. 3d 553, 558 (1986) (citations omitted) (reversing a fee award) ("an attorney should present '(1) evidence, documentary and oral, of the services actually performed; and (2) expert opinion, by [the applicant] and other lawyers, as to what would be a reasonable fee for such services.'").

And it does not appear that the various firms actually billed anyone for their time. Mr. Lamping and the Wagstaff firm have not submitted any actual bills or invoices, nor timesheets, but merely forms of computer print-outs. The same holds true for Ms. Gamez, whose redactions are unexplained and unsupported. All of them seek fees for matters that had nothing to do with the bifurcated probate trial.

Why Consilio incurred $92,000 in "data management" fees is unexplained.

On their faces, the Lapping firm's invoices reflect wasteful duplication on the part of "Stuart and team." *E.g.,* Claim 16-2 at 223. And with the conferences with "Stuart, Frank and Alicia." *Id.,* at 224. Mr. Lapping did not participate in anything in the probate court, so his bills should not have been submitted.

Stuart's "Time List" is overreaching, and unsupported. His "reviews" of various documents are exorbitant. *Id., passim.* As are his repeated entries for "draft timeline of events." *Id.* His "hourly rate" of $437.50 is pulled out of the air. *Id.,* at 241. And there is no explanation for his extensive redactions. *Id.* at 266-68.

**D.  The "claimants'" submissions are wholly unsupported.**

For reference, we use Beth's claim, number 20, which duplicates Stuart's and the others' claims:

***Claim 20, Part 6, Lamping declaration:***

Bankruptcy Case No. 22-30028 - DM

-19-
OBJECTIONS TO STUART SCHOENMANN ET AL's CLAIMS

"… my clients incurred attorney fees totaling $179,685.00 and expenses totaling $2,028.24 in connection with services performed by my firm." It doesn't say for what. There are no less than 27 entries for "telephone conference with Ms. Gamez." There is no explanation of what these involved. There are no less than 66 entries for "review and analysis" or "review." There is no claim or any evidence that any of these, or the rest of the time entries, were reasonable. Nor is there any evidence that any of these bills has actually been "paid" by the claimant or that the claimant is responsible for paying them.

### *Claim 20, Part 7, Busch declaration:*

All the time entries are redacted, without explanation. Again, there is no claim, and no evidence, that any were reasonable or not duplicative of other work done by other attorneys. Nor is there any evidence that any of these bills has actually been "paid" by the claimant or that the claimant is responsible for paying them.

### *Claim 20, Part 8, Gamez declaration:*

On their faces, the Gamez time entries are fundamentally suspect. There are numerous entries of exactly 1.0 hour (or over 1.0 hour). Most of the others are exactly 0.2 hours, with only 19 entries of 0.1 hours. Beginning January 19, 2022, all the entries are redacted. Again, there is no claim, and no evidence, that any of them was reasonable or not duplicative of other work done by the claimants' myriad array of counsel. Nor what was discussed.

The exhibits A and B, referred to in ¶ 4, merely refer to "hours billed and expenses incurred." Exhibit C, referred to in ¶ 7, refers to expenses "incurred." Exhibit D, referred to in ¶ 8, refers to an "invoice." So do Exhibits F, G and H (see ¶¶ 10, 11, 12).

Nor is there any evidence that any of these bills or invoices has actually been "paid" by the claimant or that the claimant is responsible for paying them.

### *Claim 20, Part 9, Lapping declaration:*

Again, there are numerous duplicative and overlapping time entries involving "telephone calls" with other counsel, without any explanation of what they entailed. There is no claim or evidence that they are reasonable. It appears that Mr. Lapping is the only lawyer who has actually

Bankruptcy Case No. 22-30028 - DM

been paid anything. He indicates that he billed $215,908.93, but that he "resolved" an undisclosed

billing dispute with Stuart with a "compromise" deduction of $69,793.91, so he was actually paid

$146,115.12. But Stuart, *et al.,* have asked for the entire $215,908.93. See Claim 20, Part 2,

Supplement, seeking this amount. This, of itself, is grounds for rejecting the entire claim.

### Claim 20, Part 10, Hiser invoices;

There is no supporting declaration. All the time entries are redacted, without explanation.

There is no evidence of the reasonableness of these charges. And no evidence that any of them

has been "paid" by the claimant or that the claimant is responsible for paying them.

### Claim 20, Part 11, Silver declaration:

All his entries are redacted. He simply refers to his "billing records," without any further

explanation, much less any evidence of reasonableness. And no evidence that they were "paid" by

the claimant or that the claimant is responsible for paying them.

### Claim 20, Part 12, Borris declaration:

He simply says "my clients incurred attorney fees …" He provides no evidence of

reasonableness or payment. There are no entries under the heading "Description," leaving us to

guess at what he may or may not have done.

### Claim 20, Part 13, Shepherd invoices:

There is no supporting declaration. All the time entries are redacted, without explanation.

There is no evidence of the reasonableness of these charges. And no evidence that any of them

has been paid.

### Claim 20, Part 14, Stuart Schoenmann invoices:

There is no supporting declaration. Most of the entries are for undocumented telephone

calls or "review e-mail from A. Gamez" or "review documents," without any further description.

After January 16, 2022, all the entries are redacted. As noted above, his "hourly" rate is pulled out

of thin air. And there is no evidence he paid anything, or that they were reasonable.

### Claim 20, Part 15, Stuart Schoenmann invoices:

Bankruptcy Case No. 22-30028 - DM

-21-

There is no supporting declaration, and only a reference to "general expenses." There is no evidence of reasonableness or payment.

## V. The Claimants are barred because of their unclean hands and subornation of perjury.

### A. Charlotte Schoenmann's perjury in the probate court bifurcated trial constitutes bad faith and vitiates any application of the PMA's attorneys' fee provision.

As set forth in the accompanying declaration of E. Lynn Schoenmann ("ELS Decl."), the witnesses who testified for the plaintiffs at trial, other than Charlotte Schoenmann (Stuart's wife), consisted of the following:

1. Patrick Chylinski, Expert witness
2. Michelene Insalaco, Donn's lawyer
3. Stuart Schoenmann (Executor, Plaintiff, Beneficiary)
4. Celeste Lytle (Beneficiary)
5. Alicia Gamez, Donn's and subsequently Probate Estate's counsel
6. Beth Schoenmann (Beneficiary)
7. Colette Sims (Beneficiary)
8. Harry Morgan, Expert witness
9. Cheryl Sena, Donn's PMA lawyer

[ELS Decl. ¶ 3]

None of these witnesses was a disinterested witness, nor a percipient witness to any interaction between Lynn and Donn Schoenmann in the two months when they and Donn's lawyer were negotiating the PMA. [ELS Decl. ¶ 4]

Chylinski and Morgan were experts who had never met either Donn or Lynn and had no personal knowledge of their interaction with each other. [ELS Decl. ¶ 5]

Insalaco was present for one meeting with Donn as her client, and Lynn and her lawyer, and otherwise never witnessed any interaction between Donn and Lynn. [ELS Decl. ¶ 6]

Gamez never witnessed any interaction between Donn and Lynn, and first met Lynn in probate court after Donn's death. [ELS Decl. ¶ 7]

Sena, Donn's lawyer in the PMA negotiations, testified that she had never met Lynn and therefore never witnessed any interaction between Donn and Lynn (actually, time records confirmed Lynn's recollection that they had met one time in Sena's office). [ELS Decl. ¶ 8]

Bankruptcy Case No. 22-30028 - DM

-22-
OBJECTIONS TO STUART SCHOENMANN'S FEE CLAIMS

1   Stuart, Celeste, Beth and Colette as beneficiaries, with a vested interest in the outcome,

2   were not disinterested. [ELS Decl. ¶ 9]

3       The tenor of the probate Court's Tentative Decision was that Lynn "wore Donn down"

4   and therefore used "duress" and "undue influence" to coerce him into signing the PMA. [ELS

5   Decl. ¶ 10]

6       The plaintiffs had not one percipient, disinterested witness to attest to behavior that "wore

7   Donn down," nor to witnessing any acts of "duress" or "undue influence" or "coercion" (or

8   abuse), that were essential to their case. Even the non-percipient and non-disinterested testimony

9   was primarily hearsay. [ELS Decl. ¶ 11] This presented an evidentiary problem for the plaintiffs –

10  a void that Charlotte stepped in to fill, with demonstrably perjurious testimony.

11  **B. Charlotte Schoenmann committed perjury in the probate trial.**

12      To establish ostensible "coercion," Stuart's Verified Petition in the probate court asserted

13  that:

14      156. As had been her practice for the previous several years, Lynn wore Donn down
        through a constant barrage of abusive emails and phone calls.

15

16      157. Donn traveled to Albuquerque to be with Stuart and his family in October
        2016…Lynn called at all hours to criticize the fact that Donn was in New Mexico.

17  See relevant Verified Petition pages [ELS Decl. ¶ 12, Ex. 2]. The reference to "October 2016" is

18  incorrect. Donn Schoenmann's trip to Albuquerque was in September 2016. [ELS Decl. ¶ 12]

19      Charlotte Schoenmann's relevant testimony is found in the Transcript of Trial – Day 4,

20  Conducted on November 5, 2021 at pages 673- 676 [ELS Decl. ¶ 13, Ex. 3]. It concerns a visit

21  Donn made to their home in Albuquerque, New Mexico in September 2016. Donn arrived on

22  September 16 and departed on September 20. [ELS Decl. ¶ 13]

23      Charlotte testified as follows:

24      Q. Do you recall anything else you talked about with Donn during that visit?

25      A. Well, again, Lynn called constantly, which I knew because he had the phone on
        speaker.  And again, my office at the time was in the kitchen, so he would often be at the
26      table reading or in his room, which was right by the kitchen.

27

28                                                  Bankruptcy Case No. 22-30028 - DM

-23-

1    Q: Before we talk about those calls, did Lynn call you directly in connection with his September 2016 visit?

2    A.  I believe so.  I don't remember exactly.  I believe it was the same cautionary phone
3        calls.

   Q: So you were recalling that Lynn called Donn during that visit. And you were able to
4    overhear those calls?

5    A.  Yes.

6    Q: And I think I might have jumped in when you were explaining how.

7    Can you explain how you were able to overhear Lynn's calls to Donn?

8    A. Oh, well, he always had the phone on speaker.  And he was spending his time in an
9    area where I was working.

   Q. And how frequently did Lynn call Donn during the September 2016 visit?
10
   A. Often.  I didn't keep an exact count, but hourly.
11
   Q. How would you characterize those calls?
12
   A. Well. The calls in 2016 were quite different from the calls in 2014.  They were often
13    angry in tone.  They weren't as welcoming as the ones before, that had previously been
14    updates with the kids.

   Q. Were there any calls in particular between Lynn and Donn that you recall from this
15    visit?

16    A. Yes.  There was one call that was so upsetting we actually talked about it.

17    Q. What do you remember about that call?

18    A. He started the call in his room, and then he came into the kitchen with the phone on
19    speaker, so I had the clear sense that he wanted me to hear.

       And during that call, Lynn was yelling at him viciously, just viciously unloading
20    on him, completely no holds barred about how upset she was with the payment that Donn
21    had made to Celeste when Celeste had a debt to her former employer.

       She went on for – it felt like a long time, for several minutes, just yelling at Donn
22    about how angry, upset she was.

23    Q. Do you recall anything in particular that she said?

24    A. Just how – just – it was terrifying to listen to, so I don't remember the exact words.
   But it was all how angry she was, how dare he do that.  She had other things she was
25    planning to do with the money, those sort of things.

26    Q. Did you – I think you mentioned you and Donn discussed this call after it completed?

27    A. Yes.  Usually we just went on with our work when he would hang up with Lynn.

                                              Bankruptcy Case No. 22-30028 - DM

28

1
2

But in that case, the call was so troubling, so traumatizing for me to hear, that I said something to Donn. I don't remember exactly what I said, but I think I said something like, Wow.

3

And then Donn said to me, "I'm being punished."

4

That call never happened. Donn and Lynn did not have any phone conversations while he

5

was visiting Stuart and Charlotte in New Mexico in September 2016. [ELS Decl. ¶ 15]

6

Having listened to Charlotte's testimony in court, and knowing that it was perjury, Lynn

7

Schoenmann subpoenaed cell phone records of Verizon (her carrier) and AT&T (Donn's carrier)

8

for the relevant dates. At the time, she had only one phone (Verizon) and Donn had only one

9

phone (AT&T). [ELS Decl. ¶ 16, Exs. 4 (Verizon), 5 (AT&T)]

10

The Verizon phone logs of Lynn's calls, incoming and outgoing, and the AT&T phone

11

logs of Donn's calls, incoming and outgoing, are completely consistent with each other (note that

12

AT&T phone logs are expressed in GMT (Greenwich Mean Time) and Verizon in local Pacific

13

Time). [ELS Decl. ¶ 17]

14

The phone logs confirm that Lynn and Donn did not have a phone conversation during the

15

entire time – from September 16 to September 20, 2016 – when Donn was visiting with Stuart

16

and Charlotte in New Mexico. [ELS Decl. ¶ 18] The conversation that Charlotte testified to,

17

under oath, did not happen. She made it up, out of whole cloth, and lied under oath. Lynn did not

18

call Donn "repeatedly" much less "hourly." She did not call him at all. Lynn never "yelled" at

19

him about anything, or that Donn had "paid" for Celeste Lytle's debt to her former employer. (In

20

point of fact, the "debt" was for over $350,000 that she had stolen from her employer.) [ELS

21

Decl. ¶ 19]

22

Charlotte Schoenmann's testimony was perjury. It was material, indeed crucial to Stuart's

23

and his siblings' and niece's claim that Lynn had "coerced" Donn into signing the PMA by

24

wearing him down with abusive conduct. It was the *only* testimony Stuart *et al.* offered of any

25

allegedly (but falsely) actual interaction between Lynn and Donn in the relevant time period

26

leading up to the signing of the PMA. [ELS Decl. ¶ 20]

27

**C. Charlotte Schoenmann's perjury constitutes bad faith warranting a denial of fees.**

28

Bankruptcy Case No. 22-30028 - DM

Case: 22-30028   Doc# 784   Filed: 11/10/25   Entered: 11/10/25 09:11:32   Page 25 of 27

The decision in *Black v. Akins (In re Akins),* 640 B.R. 687, 713 (Bankr. E.D. Cal. 2022), is instructive (emphasis added):

> In *Schwartz*[*-Tallard,* 473 B.R. 340 (B.A.P. 9th Cir. 2021), subsequent history not included)], the Bankruptcy Appellate Panel did discuss that a court "may award a prevailing party attorneys' fees when another party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* at 347 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 33, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)). This authority is granted under the court's inherent sanctioning power. *Chambers*, 501 U.S. at 33.

> 10 Moore's Federal Practice - Civil § 54.171 (2021) (citing *Chambers*, 501 U.S. at 43-51); *see also Alyeska Pipeline Serv. Co. V. Wilderness Society*, 421 U.S. 240, 258-59, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975), discusses this principle of law, stating:

>> When a party acts "in bad faith, vexatiously, wantonly, or for oppressive reasons," the court may employ its inherent equitable powers to award attorney's fees as sanctions. Such a fee award is permissible under the bad faith exception to the American Rule, and its purpose is to compensate the wronged party, punish the wrongdoer, and protect the integrity of the court.

> This exception only applies to bad faith relating to conduct in the litigation. *Association of Flight Attendants v. Horizon Air Indus., Inc.*, 976 F.2d 541, 549 (9th Cir. 1992). **However, the prevailing party's bad faith may also serve as a ground for denying costs or attorney's fees to which the prevailing party would be otherwise entitled.**

The court then followed this with a discussion that cited *Hutto v. Finney,* 437 U.S. 678, 689, n.14 (1978), for the proposition that," if a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party, *Universal Oil, supra*, at 580, as it may when a party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'" *Id.,* 640 B.R. at 714.

"Clearly, committing perjury is acting in 'bad faith.'" *Pruco Life Ins. Co. v. Cal. Energy Dev.,* No. 3:18-cv-02280-DMS-AHG, 2021 U.S. Dist. LEXIS 113049, at *8 (S.D. Cal. June 16, 2021) (citation omitted); *Cf. Vogel v. Tulaphorn, Inc.*, No. CV 13-464 PSG (PLAx), 2013 U.S. Dist. LEXIS 200563, at *13 (C.D. Cal. Nov. 5, 2013) ("federal district courts in the Ninth Circuit routinely impose terminating sanctions when a party falsifies evidence of central importance to a case" (citations omitted). Charlotte Schoenmann's bad faith perjury is itself another, separate reason for rejecting Stuart's attorneys' fees claim.

Bankruptcy Case No. 22-30028 - DM

Case: 22-30028    Doc# 784    Filed: 11/10/25    Entered: 11/10/25 09:11:52    Page 26 of 27

1

***Conclusion***

2          The claims of Stuart Schoenmann *et al.* should be disallowed in their entirety.

3    Dated: November 10, 2025                    */s/ Loren Kieve*

4                                                Loren Kieve, as creditor

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Bankruptcy Case No. 22-30028 - DM